THE STATE, EX REL. GRANT, EXR., *v.* KIEFABER ET AL., MONTGOMERY COUNTY PLANNING COMMISSION, ET AL.*

---

*Judgment affirmed, 171 Ohio St., 326.

280

(No. 2548—Decided July 6, 1960.)

*Messrs. Coolidge, Wall & Wood*, for relator.
*Mr. Mathias H. Heck*, prosecuting attorney, *Mr. William A. Falkner, Messrs. Landis, Ferguson, Bieser & Greer* and *Mr. Rowan A. Greer, Jr.*, for respondents.

Fess, P. J.   This is an action in mandamus brought in this court by relator against the several members of the Montgomery County Planning Commission, praying that a writ of mandamus issue commanding such commission to approve a plat for a tract of approximately 400 acres to be submitted by relator containing 20,000 square feet minimum lot sizes, "provided in every other respect such plat complies with the law and respondents' regulations." In the petition, it is alleged that relator desires to plat his property into minimum lots of 20,000 square feet and that as a condition precedent to the recordation of such plat it must be approved by the respondent. The petition alleges further that respondent has stated that its approval would not be given to such a plat with 20,000 square feet minimum lot sizes even though in every other respect such plat would comply with the law and respondent's regulations, on the ground that such plat would violate the Washington Township zoning ordinance specifying that lots in the area in which relator's land is situated must be not less than 80,000 square feet. Relator alleges further that the provisions of the zoning ordinance which require lots of a minimum size of 80,000 square feet for relator's land are an unreasonable and confiscatory exercise of the police power, having no rational relation to the public health, morals or safety of the community, and respondents, by enforcing the 80,000 square feet minimum lot requirement of such

ordinance are depriving relator of his property without due process of law in violation of the Constitutions of the United States and the state of Ohio.

In the opinion rendered September 22, 1959, written by Judge Wiseman and concurred in by Judges Crawford and Kerns, a demurrer of respondents, asserting that the petition does not state a cause of action, that there is a defect of parties defendant and that an alternative writ was allowed by only one judge of the court, was overruled.

Thereafter respondents filed their answer, in which they admit that relator's land is located in an area of Washington Township zoned R-1, which is one of the five types of residence districts included in the Washington Township Comprehensive Zoning Plan, that the minimum lot area in such R-1 district is 80,000 square feet and that their senior planner, by letter dated July 27, 1959, advised counsel for relator that respondents would not approve a plat of land located in zoning district R-1, which contained lots having a minimum size of 20,000 square feet, even if in every other respect such plats complied with the law and respondent's regulations.

For a second defense, respondents allege that on May 22, 1959, prior to the commencement of the instant case, relator filed a petition in the Court of Common Pleas of Montgomery County seeking to have that portion of the Washington Township zoning ordinance which required minimum size lots of 80,000 square feet in an R-1 district declared unconstitutional as applied to relator's land, and that said action is still pending.

By leave of court, Washington Township also intervenes as a party respondent, admitting that on February 7, 1957, the voters of Washington Township, by a vote of two to one, adopted a zoning plan for the unincorporated portion of such township, under authority of Chapter 519, Revised Code, after full publicity, discussion and consideration of the reasons for and the provisions of such resolution. The township further admits that the zone plan so adopted included provisions for five types of residential districts, of which one, designated R-1 and comprising only approximately 7 per cent of the total area of the township, provides for a minimum lot area of 80,000 square feet, as part of a comprehensive plan for the entire township, taking into consideration existing and anticipated residential

and business development, existing thoroughfares, water, sewer and school facilities, topography of the land and other considerations of public health, safety and morals.

## I.
### ADEQUACY OF ALTERNATIVE REMEDIES.

At the outset, we are immediately confronted with the question as to whether relator has or had an adequate remedy at law or in equity which would defeat his right to relief by mandamus in an original action brought in this court.

1. Section 10 of Article I of the regulations of the county planning commission provides that whenever a township has adopted a zoning plan proposed subdivisions located in the zoned area submitted for approval of the commission shall conform to the requirements as specified in the zoning plan for the township or part thereof. The usual provisions for modification of the regulations in cases resulting in undue hardship and variance are incorporated in such regulations. Section 711.10, Revised Code, as amended effective October 6, 1955 (126 Ohio Laws, 929, 932), provides, *inter alia*, that, within 60 days after the refusal of approval by the commission of any plat submitted, the person submitting such plat may file a petition in the Court of Common Pleas and the proceedings thereon shall be governed by the provisions of Section 711.09, Revised Code, as in the case of the refusal of a (municipal) planning authority to approve a plat. Section 711.09 (126 Ohio Laws, 929) provides that the petition shall contain a copy of the plat sought to be recorded, a statement of the facts justifying the propriety and reasonableness of the proposed subdivision, and a prayer for an order directed to the recorder to record such plat, and may include a statement of facts to support a claim that the rules of the planning authority under which it refused to approve such plat are unreasonable or unlawful; and, if the court finds that the prayer for the recording of such plat or any modification thereof is supported by a preponderance of the evidence, it shall enter an order directed to the recorder to record such plat as originally submitted or as agreed to be modified, but otherwise the petition shall be dismissed. The judgment or order of the court may be appealed by either party on questions of law. It is to be noted that Section 711.09, Revised Code, requires that

a copy of the plat shall accompany the petition. Evidence adduced on behalf of the relator tends to show that the preparation and completion of a plat such as would be required in the instant case would entail an expense of many thousands of dollars.

It is the relator's contention, therefore, that the provisions for an appeal to the Common Pleas Court, by reason of entailing such an expense, do not afford him an adequate remedy by way of appeal. On the other hand, it is to be observed that relator may circumvent such remedy by way of appeal by relying upon the refusal of the respondent commission to record any plat containing a minimum land area of 20,000 square feet. Apparently relator has not sought to exercise his right to apply to such respondent for a variance on account of undue hardship, etc.

2. With respect to the township zoning ordinance, provision is made by statute for a township board of zoning appeals which has power to authorize, upon appeal, in specific cases, such variance from the terms of the zoning resolution as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the resolution will result in unnecessary hardship, and so that the spirit of the resolution shall be observed and substantial justice done. Sections 519.13 and 519.14, Revised Code. Article 16 of the Washington Township Zoning Resolution makes adequate provision for such an appeal to its Zoning Board of Appeals. Although no specific provision is made for an appeal to the Common Pleas Court in Chapter 519 dealing with township zoning, the provisions of the recently-enacted Chapter 2506 of the Revised Code (127 Ohio Laws, 963, 964) accord a party aggrieved by a decision of a township board of zoning appeals the right to appeal to the Common Pleas Court. This administrative appeal would not necessarily require the completion of a plat with the attendant expense as requisite to the taking and prosecution of such an appeal.

3. The established rule in Ohio is that, as used in the statute precluding mandamus, when there is a plain and adequate remedy in the ordinary course of law (Section 2731.05, Revised Code) the term, ''in the ordinary course of law,'' includes equitable as well as legal remedies; and where there is an ade-

quate equitable remedy, mandamus will not lie. 35 Ohio Jurisprudence (2d), 278, Section 31. See annotations under Section 2731.05.

The second defense in the answer of the respondent members of the commission is not supported by any evidence, perhaps because of the dismissal of relator's petition for declaratory judgment and injunctive relief pending the determination of the instant action. We are not permitted to take judicial notice of that action, but this does not prevent this court from considering or determining whether an action for declaratory judgment and injunction is available to the relator. Such an action was employed in *Curtiss* v. *City of Cleveland*, 166 Ohio St., 509, and 170 Ohio St., 127, and relief accorded the relator. It is somewhat difficult for us to understand the action of the Supreme Court in *State, ex rel. The Killeen Realty Co.,* v. *City of East Cleveland*, 169 Ohio St., 375, wherein it was asserted that the relator could and should have brought an action for a declaratory judgment. Without there passing upon the propriety of the suggested declaratory judgment action, the Supreme Court merely said it found that the jurisdictional prerequisites to the mandamus suit exist. As we interpret the *Killeen decision*, it should be limited to actions in mandamus seeking to compel the issuance of building permits in accordance with municipal zoning ordinances and should not be treated as overruling a consistent line of previous decisions holding that mandamus is inappropriate in cases where there is an adequate remedy by injunction.

We therefore reach the conclusion that relator, in the instant case, has available an adequate remedy by way of appeal, as well as declaratory judgment and injunctive relief, and that the writ should be denied upon such ground.

## II.
### Clear Right to Relief.

Notwithstanding our conclusion with respect to the adequacy of another remedy, we have proceeded to review the record, consisting of 974 pages of testimony and numerous exhibits, to ascertain whether the relator, aside from having an adequate remedy at law, has shown a clear right to relief by mandamus.

It is well settled that the right to the relief sought in mandamus must be clear. 35 Ohio Jurisprudence (2d), 254, Section 13. *State, ex rel. Michaels,* v. *Morse,* 165 Ohio St., 599.

Although some question might be raised with respect to the conditional or equivocal nature of the writ sought, in the light of our conclusion we disregard such question.

In this connection it is observed that the respondent township and the electors therein engaged in a legislative function incident to the adoption of the comprehensive zoning ordinance. A presumption of legality and good faith attends the adoption of an ordinance until it is clearly established that the legislative authority has exceeded its powers, has acted in bad faith, or has abused its legislative discretion, or that the enactment bears no reasonable relation to the morals, health, safety and welfare of the people of the community. *Benjamin* v. *City of Columbus,* 104 Ohio App., 293, affirmed 167 Ohio St., 103, *Curtiss* v. *City of Cleveland, supra.* The presumption of validity which attaches to legislative acts in general applies with equal force to zoning ordinances and regulations, and the facts to justify interference by courts with the legislative function must clearly appear from the evidence. If the legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed to control. *Cleveland Trust Co.* v. *Village of Brooklyn,* 92 Ohio App., 351, *Curtiss* v. *City of Cleveland, supra.*

Furthermore, it has been repeatedly held that a clear incompatibility between a law and the Constitution must exist before the judiciary is justified in holding it to be unconstitutional. The Supreme Court has recently held that an act of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear *beyond a reasonable doubt* that the act and constitutional guaranties are clearly incompatible. *State, ex rel. Dickman, a Taxpayer,* v. *Defenbacher, Dir.,* 164 Ohio St., 142. Whether the Supreme Court would require such a high degree of proof with respect to the unconstitutionality of an ordinance as distinguished from an act of the General Assembly, a clear incompatibility between an ordinance and the Constitution must exist before a court may declare such ordinance unconstitutional. The party asserting unconstitutionality must clearly show it, and if the question is debatable, the legislation must be upheld. *Benjamin* v. *City*

*of Columbus, supra.* Cf. *Curtiss* v. *City of Cleveland, supra.*

At the outset of this portion of the opinion, we are prone to observe that the record is replete with leading questions, hearsay testimony and legal conclusions volunteered or sought by counsel, which raises in our minds the propriety of our rules of court permitting the taking of testimony in appeals on questions of law and fact without supervision by a referee or master commissioner clothed with authority to exclude leading questions and improper, irrelevant and incompetent answers as well as improper remarks of counsel, and otherwise regulate the procedure incident to the taking of testimony. In reviewing the record, however, we have endeavored to sort the chaff from the wheat in weighing and appraising the evidence.

Washington Township is located in southern Montgomery County, immediately south of the city of Kettering, Ohio. Kettering is located immediately south of the city of Oakwood, and Oakwood is immediately south of the city of Dayton. The village of Centerville, with a population of approximately two thousand, is located about 9 miles from the center of Dayton and is in the approximate center of the township. To the east of Washington Township lies Greene County; to the south, Warren County, and to the west, Miami Township in Montgomery County.

The township has an area of 18,931 acres. It is almost exclusively agricultural and residential in character. The area south of Centerville is largely undeveloped. There is practically no industry or business in the township. The only such enterprises outside Centerville are located on U. S. Route 48. Aside from those who engage in farming or business in Centerville, the residents of the township work in Dayton and commute from their homes. There is no public sewerage system.

On February 7, 1957, the township adopted a comprehensive zoning resolution pursuant to Section 519.02, Revised Code. Prior to the submission of the resolution to the voters, a zoning commission was appointed, which proceeded with the preparation of the ordinance. Incident to preparing the resolution, the commission conducted an extensive study of land and land uses within the township and the growth of the Dayton metropolitan area. The drafters considered problems of sewerage, schools, population density, police and fire protection, the anticipated

growth of the Dayton metropolitan area, the existing uses of land in the township, its roads, topography, drainage and flood protection and desirability of preserving a residential area of large lots. The commission also reviewed a number of zoning regulations in other areas and was advised by so-called planning experts. In its deliberations, the commission endeavored to designate areas in appropriate zones dependent upon existing uses.

The comprehensive zoning resolution divides the township generally into agricultural, residential, business, manufacturing, conservation and special use districts. The residential area is divided into four single family districts as follows:

R-1. 80,000 square feet (two acres)—200 ft. frontage.

R-2. 40,000 square feet (one acre )—150 ft. frontage.

R-3. 30,000 square feet (three-quarter acre)—125 ft. frontage.

R-4. 20,000 square feet (one-half acre)—100 ft. frontage.

Approximately ten and one-half per cent of the township is designated as an R-1 area with minimum lot sizes of two acres. The R-1 zone is generally located in the northwest portion of the township in 'an area which includes substantial country homes. The terrain is rolling, uneven and rugged in spots.

After the resolution was completed, it was made available to the public, the plan was publicized in the township and numerous hearings and meetings were held prior to the election. The resolution was approved by the electors of Washington Township by a vote of approximately two to one. Apparently the electors were imbued with the epigram, ''Rus mihi dulce sub urbe est,''—''To me, the country on the outskirts of the city is sweet.'' Marcus Valerius Martialis (Martial), first century A. D.

Relator's land is situated in the southeast corner of the R-1 district and projects therefrom in such manner so that it is bounded on the north by the R-1 district, on the west and south by the R-2 district limited to 1-acre lots with 150 foot frontage, and on the east by the R-3 district limited to three-fourths acre lots with 125 foot frontage. That portion of relator's land involved in this litigation was appraised in the estate at $500 per acre. Evidence adduced on behalf of the relator tends to show that relator contemplates the development of his land by

its sale in half-acre lots himself, rather than to sell the same to a real estate developer or builder.

Relator's land, consisting of approximately 400 acres, is part of the estate known as "Normandy Farms" formerly owned by his father who died in September 1957. The house and adjacent grounds have been conveyed to a church, and the executor has granted an option to relator's wife for the purchase of a tract of approximately 30 acres on the farm's western edge, where she contemplates the construction of their country home. The area remaining consists of approximately 350 acres which are bisected by Hole's Creek. This creek has precipitous banks on part of the farm and its drainage of the entire area has been marked by occasional floods.

Witnesses on behalf of relator, consisting of officials engaged in sanitation, public health, fire protection and law enforcement, expressed opinions that half-acre zoning of relator's premises, in contrast to two-acre zoning, would have no adverse effect upon the public health, safety or morals of the community. Witnesses on behalf of respondents, consisting of residents as well as others, expressed contrary opinions that there was a direct relationship toward health, safety and morals in two-acre zoning. Evidence adduced on behalf of respondents shows that a rather acute sewerage problem confronts the township, as yet unsolved but resulting in the denial of permits for residential septic tanks, in an effort to curb pollution. Respondents' evidence further shows that on occasions Hole's Creek floods its banks, which condition would be aggravated by the platting of relator's property into half-acre lots with the consequent acceleration of the flow of surface water as a result of the construction of streets, driveways, and the run-off from the roofs of a number of residences and the surrounding lawns. Studies are under way by authorities, including the Miami Conservancy District, looking to future control of floods in the area. One of respondents' witnesses suggested as a possible solution the construction of a hundred-acre reservoir upon the Grant property adjacent to Hole's Creek. With respect to the danger of flood, Section 5 of Article II of the planning commission's regulations provides that such commission shall not approve any subdivision located in areas subject to periodic floods, but that the commission may approve the subdivision provided the developer or

subdivider agrees to perform such improvements as will render the area substantially safe for residential use; and that, prior to acting upon such proposed subdivision, the commission will secure advice from the Miami Conservancy District. It is to be presumed that relator intends to comply with this regulation in the event the prayer of the petition be granted, but the regulation poses an additional serious problem confronting relator incident to subdividing his property into half-acre lots, and in our opinion substantially detracts from the profit which relator contends would inure to him as a result of being permitted to subdivide his farm into half-acre lots.

One of relator's witnesses expressed the opinion that a builder could not afford to pay more than $315 per acre for the Grant farm, subject to two-acre zoning, but that, zoned at half-acre, it would be worth $2,500 per acre. Another witness testified that the value might run as high as $3,000 per acre in half-acre zoning. On the other hand, respondent's witnesses testify as to actual sales of acreage in excess of two acres at from $2,000 to $3,600 per acre. Residents of the R-1 area expressed opinions that their own properties were worth from $2,500 to $6,000 per acre. Thus the testimony tends to show that there is a fairly ready market for tracts of two or more acres and that the property is readily saleable as classified. Residents of the area also expressed their opinions that the value of their property was enhanced by two-acre zoning and that subdividing the Grant property into half-acre lots, with consequent construction of lesser cost homes, would result in reducing the value of their properties.

In the opinion in *State, ex rel. The Killeen Realty Co.,* v. *City of East Cleveland, supra* (169 Ohio St., 375), the court quotes with approval from Constitutional Law in Community Planning, 20 Law and Contemporary Problems, 199, where it is observed:

" 'Governmental regulation of economic activity and programs for economic and social betterment no longer are likely to face serious objections grounded in the United States Constitution. * * * However, it would be a mistake to assume that there are no important problems of constitutional law today in local planning activities. A dominant characteristic of such activities is the alteration of traditional concepts of real prop-

erty ownership. There may be some basis for a belief that the range of the police power of the states is narrower when property is regulated than when freedom of enterprise is controlled. *At some undefinable point, regulation of property shades into taking of property,* which must be compensated, though it must be conceded that the instances in which the court [United States Supreme Court] has determined that this point was exceeded are rare, and that there have been some examples of extreme legislative encroachments upon property which have gone uncompensated.' (Emphasis added.)''

Does relator's evidence reach that undefinable point of taking relator's property without compensation rather than regulation to a reasonable use thereof? We think not. As we appraise the evidence, the value of relator's property as acreage is practically the same whether it be developed in two-acre or one-half acre lots. Relator's evidence is neither clear nor convincing that he would realize a greater profit from subdividing and selling half-acre lots than that which he would realize from its sale in two or more acre so-called estate lots.

In the *Killeen case* there was no feasible economic use of an isolated parcel surrounded on three sides by less restricted uses, and a reduction of the parcel to the next restricted use was in harmony with the needs and nature of the neighborhood. Under such circumstances, the refusal to allow less restricted use was held to be an abuse of discretion and confiscatory. No such situation exists in the instant case.

Even though relator could establish that he could obtain a larger return from the platting and sale of one-half acre lots, than from the sale of two-acre lots, refusal of the planning commission to approve his plat or the Zoning Commission to grant him a variance would not be unreasonable, arbitrary or confiscatory, since the maximum possible enrichment of the owner by such disposition is not a controlling factor. *Senior* v. *Zoning Commission* (1959), 146 Conn., 531, 153 A. (2d), 415 (upgrading from 2 to 4 acres); *Simon* v. *Town of Needham,* 311 Mass., 560, 565, 42 N. E. (2d), 516, 141 A. L. R., 688 (upgrading to one acre, larger acreage not decided); *Honeck* v. *County of Cook* (1957), 12 Ill. (2d), 257, 146 N. E. (2d), 35 (upgrading to five-acre lots); *Fischer* v. *Township of Bedminster* (1952), 11 N. J., 194, 93 A. (2d), 378 (upgrading to five-acre lots); *Flora Realty & Invest-*

*ment Co.* v. *City of Ladue* (1952), 362 Mo., 1025, 246 S. W. (2d), 771 (upgrading to 3-acre lots); *Levitt* v. *Village of Sands Point* (1959), 6 N. Y. (2d), 269, 160 N. E. (2d), 501 (upgrading to 2-acre lots of land on northern tip of peninsula, consisting of rolling and partly wooded land); *Clemons* v. *City of Los Angeles* (1950), 36 Cal. (2d), 95, 222 P. (2d), 439; *Clary* v. *Borough of Eatontown* (1956), 41 N. J. Super., 47, 124 A. (2d), 54, citing *Fischer* v. *Township of Bedminster* (1952), 11 N. J., 194, 206, 93 A. (2d), 378 (for decision of Superior Court, see 21 N. J. Super., 81, 90 A. [2d], 757); *Cobble Close Farm* v. *Bd. of Adjustment* (1952), 10 N. J., 442, 451, 92 A. (2d), 4; *Berdan* v. *Paterson* (1948), 1 N. J., 199, 205, 62 A. (2d), 680; and *Rockaway Estates, Inc.,* v. *Rockaway Twp.* (1955), 38 N. J. Super., 468, 478, 119 A. (2d), 461, 466. The above authorities likewise sustain the validity of such regulations as a reasonable exercise of the police power as against constitutional attack. See, also, *Fuller* v. *County Commrs. of Baltimore County* (1957), 214 Md., 168, 133 A. (2d), 397; and *Fischer* v. *Township of Bedminster* (1952), 21 N. J. Super., 81, 90 A. (2d), 757, holding a zoning ordinance adopted by a sparsely-settled township prohibiting building on lots less than five acres, less than 200 feet wide, or closer than 100 feet to line of abutting street, was, as far as it affected owner of five-eighths of an acre, neither arbitrary nor unreasonable and a proper exercise of the zoning and police power of the township. See, also, decision of the New Jersey Supreme Court (1952), 11 N. J., 194, 93 A. (2d), 378. *Caruthers* v. *Board of Adjustment* (Texas, 1956), 290 S. W. (2d), 340, minimum lot area of 40,000 square feet; *Bilbar Construction Co.* v. *Eastown Twp. Board of Adjustment* (1958), 393 Pa., 62, 141 A. (2d), 851, one acre minimum lot area; *Volpe Appeal* (1956), 384 Pa., 374, 121 A. (2d), 97, minimum lot area of 20,000 square feet; and *De Mars* v. *Zoning Comm. of Town of Bolton* (1954), 19 Conn. Sup., 24, 109 A. (2d), 876, holding ordinance fixing minimum lot area in town as 40,000 square feet in residence Zone A, 22,500 square feet in residence Zone B, and 40,000 square feet in business zone, not illegal.

On the other hand, certain authorities have held establishment of high minimum lot areas to be unreasonable and unconstitutional. In *Board of County Supervisors* v. *Carper* (1959), 200 Va., 653, 107 S. E. (2d), 390, the zoning authority, by amend-

ment, undertook to zone lots in the western two-thirds of a county near the District of Columbia into a minimum of two-acre lots. At the time the amendment was adopted, the county was declared to be the fastest growing county in the United States, and between 1950 and 1957 the total number of dwellings had increased from 24,000 to 55,000. The eastern one-third of the county was zoned generally for seven residential districts, with minimum lots running from one acre and one-half acre down to 8,400 square feet. The court held that the practical effect of the amendment was to freeze development of the western two-thirds of the county, resulting in preventing people in the low income bracket from living in the western area and forcing them into the eastern area. The reviewing court agreed with the finding of the trial court that the real purpose of the amendment was to prevent development of the western two-thirds of the county as a residential area and to channel the county's growing population into the eastern one-third and that it therefore was unreasonable and arbitrary, would serve private rather than public interests and would bear no relation to the health, safety, morals, prosperity and general welfare. See, also, *Hitchman* v. *Twp. of Oakland* (1951), 329 Mich., 331, 45 N. W. (2d), 306; and *Dilliard* v. *Village of North Hills* (N. Y. Supreme Ct., Nisi Prius, 1949), 195 Misc., 875, 91 N. Y. Supp. (2d), 69, holding provision of village building zone ordinance prescribing two-acre minimum lot area unconstitutional. But contra see *Franmor Realty Co.* v. *Village of Old Westbury* (1952), 280 App. Div., 945, 116 N. Y. Supp. (2d), 68, holding similar provision not unconstitutional; and *Levitt* v. *Village Sands Point* (Appellate Division, 1958), 174 N. Y. Supp. (2d), 283, holding upgrading from one to two acres did not restrict property to a use for which it was not reasonably adapted.

Although deprivation of realization of a greater profit is a factor to be considered, it is not controlling unless on the whole the comprehensive plan of zoning is unreasonable. The essential question is whether it is clearly demonstrated that the classification has no "real and substantial relation" to one or more of the zoning considerations expressed in the statute. *Roselle* v. *Wright* (1956), 21 N. J., 400, 408, 122 A. (2d), 506, 510. Furthermore, the control of density of population is held to be a proper zoning objective and a commonly approved technique

for that purpose is minimum building lot areas. *Clary* v. *Borough of Eatontown* (1956), 41 N. J. Super., 47, 124 A. (2d), 54.

Plaintiff seeks to distinguish authorities in other jurisdictions approving high minimum lot areas upon the ground that in such jurisdictions broad statutory authority is conferred upon zoning agencies to regulate for the comfort, prosperity and general welfare of the people of the community in addition to the conservation of public health, safety and morals, as referred to in the purpose clause of Section 519.02, Revised Code, as amended effective September 17, 1957, subsequent to the adoption of the zoning resolution.

Relator asserts that the constitutional authority of a township to adopt zoning regulations is limited to considerations only of public health, safety and morals under Section 519.02, in contrast with the broader and more comprehensive purposes accorded municipalities under Section 713.06. With this contention, we are unable to agree. In the interpretation of ambiguous language in a statute, resort may be had to the stated purpose incorporated in such statute as an aid to the construction of such ambiguous language. But it is well understood that the scope of the operation or applicability of a statute is not limited or prescribed by the stated object or purpose prompting its enactment. 37 Ohio Jurisprudence, 665, Section 364 [50 Ohio Jurisprudence (2d), 233, Section 248]. The authority cited in support of the text is *Columbus* v. *Federal Gas & Fuel Co.* (1910), 13 N. P. (N. S.), 394, 22 O. D., 250, but the opinion was written by an eminent Common Pleas Judge. See, also, 50 American Jurisprudence, 297 and 298.

Furthermore, Section 519.02, Revised Code, specifically authorizes a board of township trustees, in accordance with a comprehensive plan, to regulate, among other matters, percentages of lot areas which may be occupied and the uses of land for trade, industry, residence, recreation or other purposes in the unincorporated territory and for such purposes to divide all or any part of the unincorporated territory into districts or zones of such number, shape and area as the board determines. It follows that relator's contention, that decisions arising under other statutory provisions incorporating, by way of a purpose clause, general welfare as well as public health, safety

and morals, is untenable, and that such decisions are applicable to a determination of the decision in the instant case.

With regard to the reasonableness of the classification of relator's property in the R-1 two-acre zoning area, opinions of the witnesses are expressed pro and con. In accordance with the provisions of the last paragraph of Section 519.05, Revised Code, the proposed zoning plan was submitted to the respondent planning commission for advice and counsel, which disapproved the plan. One of the reasons for disapproval was that the provisions for lot sizes, which were considerably different from the then present county standards, were deemed unreasonable.

It is therefore clear that there are factors which point in each direction, and the court will, in such situation, uphold the ordinance. Where there is room for fair differences of opinion concerning the reasonableness of the zoning classification, the presumption of validity of such classification prevails and the legislative judgment will be upheld. Relator has failed to prove by clear or affirmative evidence that the restriction is arbitrary, unreasonable, or constitutes a taking of his property without compensation.

It is therefore concluded that the relator has available an adequate remedy by way of appeal as well as declaratory judgment and injunction, and has failed to show a clear right to relief.

*Writ denied.*

DEEDS and SMITH, JJ., concur.

FESS, P. J., DEEDS and SMITH, JJ., of the Sixth Appellate District, sitting by designation in the Second Appellate District.